# CONFIDENTIAL AGREEMENT

ORIGINAL

* * *

BETWEEN: **Boat Dealers' Alliance, Inc., a Florida corporation, having its place of business at 3983 Pine Point Road, St. Cloud, Minnesota 56303 (referred to in this Agreement as "*BDA*"),**

AND: **Outboard Marine Corporation - Marine Power Products Group, a Delaware corporation, having its executive office at 200 Sea-House Drive, Waukegan, Illinois 60085 (referred to in this Agreement as "*OMC MPPG*").**

IN CONSIDERATION of the promises and mutual covenants set forth below, the parties agree as follows:

**1. SUPERSEDING EFFECT:**

This Agreement (including attached exhibits) supersedes all prior oral or written agreements, if any, between the parties and constitutes the entire agreement *between OMC MPPG* and *BDA* concerning the subject matter of this Agreement.

**2. DURATION OF THIS AGREEMENT; PROCEDURE FOR TERMINATION:**

A. This Agreement shall be in full force and effect for an initial period of not less than five (5) years from the "anniversary date" of:

July 1, 1997

B. Either party may terminate without cause if, not less than ninety (90) days prior to the anniversary date, written notice is provided as set forth in Section 23 of this Agreement. After the initial five-year period, this Agreement shall continue in effect



M 00088

EXHIBIT A

from year-to-year. After the initial five year period, either party may terminate this agreement for valid cause, on ninety (90) days notice.

3. **PURPOSE OF THIS AGREEMENT:**

*BDA* is a buying and merchandising cooperative composed of independent retail marine dealers located throughout the United States that desire to achieve efficiencies in purchases and promotions of marine equipment and non-disposable marine supplies. *OMC MPPG* is affiliated with *BDA* to more efficiently sell marine outboard power products to *BDA* for the benefit of *BDA* and its MEMBERS (whose names and those of their affiliated entities [if any] authorized to receive the benefits of membership are listed on **Exhibit C** to this Agreement, which from time-to-time may be revised by *BDA*). *OMC MPPG* reserves the right to decide if new members shall be *OMC MPPG* dealers; such appointments will not be unreasonably withheld. *OMC MPPG* shall work with *BDA* to identify markets and dealers that would be beneficial both to *BDA* and *OMC MPPG*. Finally, *OMC MPPG* seeks to be the exclusive supplier to *BDA* of outboard engines by Model Year 2000, and to receive the benefits of promotions by *BDA'S* MEMBERS to retail customers and end-users.

4. **BDA'S AGREEMENT TO PROMOTE OMC'S PRODUCTS:**

*BDA* agrees that for the duration of this Agreement it and its Members will promote *OMC MPPG's* products that are set forth in **Exhibit A**, in accordance with the *BDA'S* standard promotional practices, and periodically will provide *OMC MPPG* with information concerning marketing plans and copies of promotional materials.

5. **OMC MPPG'S AGREEMENT TO REPORT SALES TO BDA:**

During the term of this Agreement, *OMC MPPG* agrees that it will report to the *BDA* office by the 15th of each month, every purchase (by invoice number, date and amount) made in the previous month by or through each MEMBER listed in **Exhibit C** (as from time-to-time revised by *BDA*). *BDA* represents to *OMC MPPG* that all MEMBERS have consented to the reporting requirement set forth in this contract. The word "MEMBER," as it appears in this Agreement, refers only to the active MEMBER(S) of *BDA*. In the event *OMC MPPG* invoices *BDA* directly, it need not report separately concerning purchases made during the previous month.

6. **OMC MPPG'S AGREEMENT TO ACCUMULATE PROMOTIONAL ALLOWANCES OR OTHER INCENTIVES:**

*OMC MPPG* agrees that, to the extent that any promotional allowances, incentives, discounts, rebates, and any other allowances (collectively referred to elsewhere in this Agreement, simply as "allowances") exist, they shall be payable to *BDA* on behalf of each MEMBER. *OMC MPPG* agrees further that it will issue allowances to *BDA* on behalf of its MEMBERS pursuant to the method set forth in Exhibit A, that such allowances will not be reduced below the level set forth in Exhibit A, and that such allowances will be accumulated and sent directly to the *BDA* office at least every quarter of each calendar year of this Agreement. *OMC MPPG* agrees that it will pay all allowances to the *BDA* office no later than within 45 days of the end of each quarter, and that *BDA* shall thereafter handle actual distribution to its MEMBERS.

In the event *BDA* so requests, payment of allowances shall be made in a consolidated check to *BDA*, accompanied by a detailed breakdown of distribution, by MEMBER, on the basis of which *BDA* will thereafter distribute to MEMBERS on behalf of *OMC*.

7. **OMC'S AGREEMENT TO PROVIDE MOST FAVORED STATUS TO BDA:**

*OMC MPPG* represents and agrees that the promotional allowances, incentives, discounts, rebates, and any other marketing incentive(s) paid or credited to *BDA* on behalf of MEMBERS are better than or equal to the most favorable promotional allowances it pays or credits for products of like grade and quality sold to other *OMC MPPG* customers. In the event *OMC MPPG* pays or credits a more advantageous promotional allowance or other marketing incentive to any other customer, *BDA* promptly shall be notified of the criteria it would need to meet in order for it or its Members to receive the more advantageous promotional allowance or other marketing incentive that *OMC MPPG* has paid or credited to its other customer. *BDA* must meet the criteria set forth in order to qualify for the extra incentive.

8. **OMC'S AGREEMENT NOT TO REDUCE OR WITHHOLD PROMOTIONAL ALLOWANCES:**

*OMC MPPG* agrees that it will not reduce or withhold any promotional allowance that may be earned by *BDA* or its MEMBERS for any reason. This paragraph does not limit *OMC'S* ability or authority to take other appropriate actions that it deems necessary vis-a-vis an individual *BDA* MEMBER in order to protect *OMC'S* legal rights with regard to the payment terms and conditions of individual sales to *BDA* MEMBERS.

9. **OMC'S AGREEMENT TO EXTEND BUYING PERIOD FOR PURCHASES IN CONNECTION WITH CONFERENCES:**

*BDA* agrees to require all MEMBERS to attend buying conferences. *OMC MPPG* and *BDA* acknowledge that it is in their mutual interest to encourage MEMBERS to maximize the marketing value of buying conferences, and to encourage that actual meetings between MEMBERS and *OMC MPPG* be devoted to matters of mutual advantage in addition to placement of orders. For these reasons, it is in the best interest of *OMC MPPG* to extend any special pricing offered at a conference, and to permit buy-ins prior to, during, and after each conference, to the extent any are offered. Accordingly, *OMC MPPG* agrees to permit each MEMBER that actually attends a conference, to place orders at the special prices offered at a conference, for a period that extends from two weeks before, to two weeks after, every *BDA* buying conference.

10. **OMC'S RESPONSIBILITY TO ATTEND BDA'S BUYING CONFERENCES:**

*OMC MPPG* agrees that at least one person with senior management responsibilities shall attend every *BDA* buying conference to which *OMC MPPG* is invited. *OMC MPPG* shall be responsible for paying registration fees for all of its personnel who attend *BDA* conferences.

11. **OMC'S AGREEMENT TO PAY "BONUS POINTS" TOWARDS BDA'S INCENTIVE PROGRAM:**

*OMC MPPG* shall have the option to participate in the "bonus points" program on items promoted and purchased in conjunction with periodic flyers or other promotional activities. Such "bonus points" shall be valued at the rate of one-cent per point, redeemable through *BDA'S* Incentive Program by its MEMBERS 'sales personnel.

12. **OMC'S AGREEMENT TO NOTIFY BDA OF ALL PRICE INCREASES:**

*OMC MPPG* agrees to provide in writing to *BDA*, one month's notice -- or the maximum amount of time of notice it provides to any other customer, whichever period of time is greater -- concerning any increase in price(s) of its product(s).

13. **INDEMNITY**

OMC MPPG agrees to indemnify and defend *BDA* against all liabilities, losses, damages, costs, and reasonable attorneys fees and expenses that *BDA* may suffer, incur or pay out by reason of claims, demands or suits against *BDA* alleging a design or manufacturing defect or negligence on the part of *OMC MPPG* relating to any products sold to BDA during the term of this Agreement.

BDA agrees to provide *OMC MPPG* with written notice of such claims or demands not later than 10 days after receipt by BDA.

14. **OMC'S AGREEMENT TO EXTEND WARRANTY PROTECTION AND SALES ASSISTANCE TO MEMBERS:**

*OMC MPPG* agrees that its standard warranty and sales assistance policies shall inure directly to the benefit of MEMBERS, as provided for in Exhibit "D," unless greater warranty protection and/or sales assistance otherwise has been agreed upon between *OMC MPPG* and *BDA*, in which event such increased warranty protection and/or sales assistance shall inure directly to the benefit of MEMBERS.

15. **BDA'S AGREEMENT TO ACCEPT SUPPLEMENTAL TERMS FROM OMC:**

Any supplemental terms or conditions agreed upon between *OMC MPPG* and *BDA* shall be stated in Exhibit D, be initialed by *BDA*, and be attached to this Agreement. In the event that *OMC MPPG* adopts any portion of its standard sales agreement as Exhibit D, those aspects which are inconsistent with the spirit or intent of this Agreement shall not apply, and to that extent, those aspects shall not be deemed to be incorporated into this Agreement.

16. **OMC'S AGREEMENT TO ABIDE BY CONFIDENTIALITY PROVISIONS:**

Each party deems this Agreement, and all information relating to merchandising programs, purchasing programs, conference procedures, correspondence, reports, special price lists, and any other aspects of either party's operations to be highly confidential. Each party agrees to respect the requirement that all such information and documents containing such information must be maintained in the strictest confidence, and only disclosed to persons on a "need to know" basis. Each party agrees that all of its principals, officers, employees, and agents who are permitted to have access to such confidential information and documents will be required to maintain the same in the strictest confidence, and that each party will take steps to restrict access to the same, and that each will ensure there will not be disclosure to anyone who is not authorized to have access to such information or documents. Each party further agrees to immediately inform the other party of any unauthorized disclosure, and to take steps to rectify the unauthorized disclosure, including but not limited to seeking an injunction to prohibit further disclosure, to retrieve any documents improperly disclosed, to take steps to rectify the unauthorized disclosure, and to fully cooperate with the other party in these regards. Each party further agrees to require any sales representative to whom confidential information is divulged, to sign a confidentiality agreement in the form as set forth in Exhibit B.

17. **NON-USE OF PARTIES' NAMES:**

Both parties agree that, except in the ordinary course as is the custom in the trade, neither will use the other party's name in advertisements, promotional material, news releases or for other commercial purposes regarding the subject matter of this Agreement without the prior written approval of the other party.

18. **ASSIGNMENT; BINDING EFFECT:**

A. This Agreement may be assigned, in whole or in part, to any entity in which the assignor maintains an equity interest of not less than 50%.

B. This Agreement will inure to the benefit of, and will be binding upon the successor(s) or assigns, if any, of either party, to the maximum extent permitted by operation of law and the limitations set forth within this Agreement.

19. **INJUNCTIVE RELIEF; APPLICABLE LAW; VENUE; ATTORNEYS FEES:**

A. Both parties acknowledge that a lawsuit merely for damages that occur, or are likely to occur, as a consequence of a breach of any of the provisions of this Agreement will be inadequate, and that either party is entitled to injunctive relief in case of any breach, as well as all other relief available via law or equity.

B. This Agreement shall be construed and interpreted in accordance with the laws of the State of Minnesota.

20. **ENTIRE AGREEMENT; SEVERABILITY CLAUSE; SUB-TITLES; WAIVERS:**

A. This Agreement (including attached Exhibits) contains the entire understanding and agreement of the parties. Any amendment, alteration, modification, or revocation shall be in writing and signed by the parties.

B. If any part of this Agreement is held to be invalid or unenforceable, such holding will not affect any other part of the Agreement that can be given binding effect. If, moreover, any part of this Agreement is for any reason held to be excessively broad as to time, duration, geographical scope, activity or subject, it will be construed, by limiting or reducing it, or by adding a provision as similar to such unenforceable provision as may be possible so as to be legal, valid, and enforceable to the maximum extent necessary for the protection of both parties.

C. All sub-titles in this Agreement are included solely for ease of reference and shall not control or limit the substance of any portion of this Agreement.

D. All waivers of any right(s) provided by this Agreement or by law, or of any breach or default by a Party shall be in writing. The failure to demand specific performance shall not constitute a waiver of any provision of this Agreement, or a waiver of any other default. The waiver by either party of a specific breach of, or default under, this Agreement by the other shall not be deemed a waiver of any subsequent breach or default.

21. **ACTS REQUIRED TO EFFECTUATE THIS AGREEMENT:**

Both parties agree to execute any document(s), resolution(s), or other instrument(s) which may be required of either of them or which may be necessary for the purpose of fulfilling, effectuating, or implementing the provisions of this Agreement.

22. **CONSTRUCTION OF THIS AGREEMENT:**

This Agreement has been prepared by *BDA* and was thoroughly reviewed by *OMC MPPG* and its legal counsel. The parties agree that this document (including exhibits) is a product of all of their efforts, that it expresses their mutual understandings, and that it should not be interpreted in favor of either party or against either of them merely because of *BDA'S* efforts in preparing it.

23. **NOTICES; CORRESPONDENCE AND WRITTEN APPROVALS:**

All notices, correspondence, and written approvals pursuant to this Agreement shall be sent by the parties via express mail, commercial overnight courier, or facsimile, to the following address or fax number:

**IF TO *OMC MPPG*:**

**Peter L. Schelle**
**Vice President**
**North American Sales & Service**
**Marine Power Products Group**
**Outboard Marine Corporation**
**200 Sea-Horse Drive**
**Waukegan, Illinois 60085**
**Fax Number: (847) 689-5576**

**IF TO *BDA*:**

**Patrick T. Manion**
**Executive Director**
**Boat Dealers' Alliance**
**3983 Pine Point Road**
**St. Cloud, Minnesota**
**Fax Number: (320) 255-9946**



M 00094

or to any other address or authorized person, or facsimile number, provided that prior written notice is given to the other party with respect to any change in this information. In the event that any notice, correspondence or approval is sent via facsimile, such message is effective upon verified receipt of the facsimile, provided that a copy of the message also is sent via express mail or courier pursuant to this section.

IN WITNESS THAT THIS AGREEMENT HAS BEEN ACCEPTED BY *OMC MPPG* AND BY *BDA*, AND IS BINDING ON EACH OF THEM, an authorized agent of each has signed below, and has dated the respective signature, and has affixed a corporate seal or has initialed the same in lieu of a seal.

**OUTBOARD MARINE CORPORATION, INC. - MARINE POWER PRODUCTS GROUP**

By: [signature]
Peter L. Schelle
*Vice President*
North American Sales & Service

Date: 9/26/97

**BOAT DEALERS' ALLIANCE, INC.**

By: [signature]
Patrick T. Manion
*Executive Director and CEO*

Date: 9-26-97

**Attachments:**

**EXHIBIT A** [Specific terms and conditions relating to price, quantity, promotional allowances, rebate, payment, products or product lines that are subject to this Agreement.]
**EXHIBIT B** [Confidentiality Agreement for use by *OMC'S* reps.]
**EXHIBIT C** [List of *BDA* MEMBERS.]
**EXHIBIT D** [Additional terms and conditions relating to sales of *OMC'S* products, etc.]

# EXHIBIT A

## JOHNSON®/EVINRUDE®
## MPPG BDA PROGRAM

- In Year One (Model Year 1998) BDA will purchase a minimum of 3,600 outboard units with 18 dealer members. As new members are added, the minimum will rise by 200 units per new member. If members are terminated, the number of units will be reduced accordingly.

- OMC will be BDA's exclusive outboard engine supplier starting July 1, 2000. BDA will be invoiced Bracket I or OMC's lowest published price. BDA will be eligible to participate in dealer programs including planning and high horsepower growth incentive programs or similar programs in existence during the term of this Agreement. BDA shall receive a 10% Volume Rebate to be paid quarterly, provided BDA is on target on a year-to-date basis with the annual purchase minimum.

- BDA will be eligible to participate in all P&A dealer programs and will receive a 5% rebate per year for achieving 15% growth over the previous year's purchases. The program goal in Model Year 1998 is $2,250,000.

- BDA shall receive a 10% maximum rebate on electric trolling motor purchases.

- OMC will bill BDA directly for all orders and drop ship to its dealer members.

- BDA members who are OMC dealers will be eligible for OMC CaShPort®.

- OMC reserves the right to confer with BDA concerning new members who wish to be OMC dealers. OMC intends to work together with BDA to identify markets and dealers which are beneficial to both BDA and OMC.

# EXHIBIT "B"

## CONFIDENTIALITY AGREEMENT

Outboard Marine Corporation Aluminum Boat Group ("OMC ABG") is a supplier to Boat Dealers' Alliance, Inc. ("BDA"). All terms and conditions of this relationship with BDA (and, until made public by BDA, the identity of its constituent Members) shall be strictly confidential. There is no reason for confidential information relating to BDA, including actual or proposed *prices, quantity discounts, rebates, promotional allowances, correspondence, reporting procedures, special incentives, and the like,* or *the volume of purchases by BDA* to be divulged to anybody outside of OMC ABG, or to anybody within OMC ABC, who does not have a genuine need to know, except as required by law. Whatever precautions are required so as not to disclose such information improperly *must* be taken, and we acknowledge that we will be bound by our assurance of confidentiality with regard to BDA.

In the event we disclose to any third party, confidential information concerning BDA, except as otherwise provided for in this Agreement, we are required to take appropriate steps to protect BDA. Our obligation to keep information confidential will continue to exist even if we no longer were a supplier to BDA. Should there ever be any question with respect to whom we may or may not communicate information relating to BDA, we first shall consult with BDA before communicating such information, and obtain BDA's approval *in writing*.

My signature at the bottom of this Agreement shall acknowledge receipt of good and valuable consideration, the receipt and sufficiency of which shall not be challenged, in return for a commitment to take all reasonably appropriate measures to assure that information provided to us in confidence by BDA, or which we provide to BDA, as well as any actual or proposed *prices, quantity discounts, rebates, promotional allowances, correspondence, reporting procedures, special incentives, and the like, or the volume of purchases*, shall be treated in a strictly confidential manner, and that no breach of confidentiality will occur by reason of our acts, statements, or omissions.

I acknowledge our confidentiality obligation and agree to be bound by this Agreement as set forth above:

______________________________
Peter L. Schelle
*Vice President*
North American Sales & Service
Marine Power Products Group
Outboard Marine Corporation
200 Sea-Horse Drive
Waukegan, Illinois 60085

______________________________
Date

______________________________
Please print name

______________________________
Signature

______________________________
Title

# EXHIBIT "C"

## Boat Dealers' Alliance Member List

Alex Stirling Marine, Inc.

Beaver Park Marina, Inc.

Boats, Inc.

Bruce Marine, Inc.

Marine One Corp.

Cope Auto and Marine, Inc.

Counce Marine, Inc.

Crocker Marine, Inc.

Custom Fiberglass Manufacturers, Inc.

"Just Add Water" Boats, Inc.

Killinger Marine Center, Inc.

Norris Marine, Ltd.

Phil Dill Boats, Inc.

Port Harbor Marine, Inc.

Russo's Marine Mart, Inc.

Summerville Marine, Inc.

Texas Marine and Brokerage, Inc.